the case of the United States v. Ms. Farr. Good morning. May it please the court, counsel for the government, good morning. Your Honors, my name is Humberto Dominguez and I represent the appellate here, LaTosha Farr. And this case involves a conspiracy of several persons who were involved in activity of filing false tax returns and subsequently obtaining those checks from those tax returns and then having to go and cash them. The center of the activity revolves around a gentleman by the name of Habib who owned a convenience store. And this gentleman had agreed to, and had actually been cashing checks in the neighborhood for quite some time, and he became involved in participating in this event by agreeing to cash checks for these people without adequate IDs. Some of the IDs were actually just photocopies and such. But there were some IDs which were real. It's hard to tell which were which because the practice of the business was to scan and store the IDs, so it's kind of hard to tell at what point which IDs were real or weren't real because the records that were kept there were obviously not the best. Given that scenario, an investigation ensued where Mr. Habib was arrested for unrelated charges and state charges, and then subsequently they began investigating him for this activity and he agreed to cooperate. And then the investigation launches in relation to Ms. LaTosha four years after the initial activity. Now, one of the first things I want to talk about is the failure to give the instruction which I requested, which was the entrapment instruction. And during the course of the trial and the testimony, cross-examination of Mr. Habib as well as the lead agent, Mr. Degnan, in this case, it came to light that Mr. Habib had been loosely watched, to say the least. There were a variety of circumstances which could lead the jury to believe that there was inadequate supervision, particularly there was a conversation of more than two minutes and that that wasn't recorded. The initial contact was made because Mr. Habib said he received a missed phone call from Ms. LaTosha Farb and then he began to contact her. As he contacted her, she had indicated to him that she was no longer in the business and no longer engaged in that activity. And he talked to her about the checks and he kept on and made several phone calls to her, many of which were recorded. And in those recordings you hear and it's clear that, look, I'm done, I don't have those. And the original phone call she placed was actually a cash, he was a check casher, a $50,000 corporate check from a corporation that was closing out and she wanted to get his help in closing that check, in cashing that check, rather. So in doing so, Mr. Habib begins the conversation with, well, you know, the checks that you did in the past, they were so good, they never bounced. I can't cash this check, but, you know, I want the smaller amounts, we like those smaller amounts. And he kept pursuing that line of communication with her until finally she said, well, maybe next year, let's see what happens if things pick up again. In the context of this case, Mr. Dominguez, how does the request for an entrapment instruction fit in with the fact that she had engaged in the alleged criminal activity before she was purportedly entrapped to do it a second time? How does that fit into the whole narrative? Normally, you know, an entrapment scenario arises when there's no indication that someone has engaged in criminal activity and is approached and then is persuaded sometimes too much by a government agent or informant to proceed. But here, she had actually engaged in some of the criminal activity, had stopped, and then there's the second approach by Mr. Habib. The re-engagement. That's it. Basically, it's true. The government's case, their evidence was that she had participated in it previously. One of the things that we presented, and it's out in California and so forth, and part of her defense was that the initial part, somebody was using her identity or acting as her. The instruction comes into the second part, the second activity, the re-engagement, where he's drawing her in, trying to get her to re-engage in the criminal conduct. And they're not mutually exclusive, meaning you can have one defense for one set of activity, and then the second activity where there was the primary evidence, which was where the videotapes were, where the recorded conversations were, basically all the product of Mr. Habib's activity being improperly, I mean, Degnam himself testified. He said, look, I want to be more specific. I don't want to misquote him. That he was, rather, that he was rather difficult to supervise, that he was needed, I think the word was a kick in the pants, because he had to try to keep him in line and so forth. So, and I think that based on the case law, if there's any evidence, more than a scintilla, and I think this far exceeds a scintilla, obviously, if there's any evidence to support, and this is a theory of defense case, give the instruction. Why not give it to him, let the jury work it out, because there was certainly a lot of evidence regarding unrecorded conversations, regarding all the contact that he had, persuading and pursuing her on tape. This is not an allegation that's being made by the defendant. This is something that's part of the evidence presented by the government. It's clearly, this is occurring, this is happening, and the jury should be given that opportunity. And part of the instruction that I specifically requested had to do with the misconduct aspect of the, where it's not necessarily the subjective entrapment defense, but then you have the objective entrapment defense, which is what I was arguing to the jury, this is objective entrapment, this is where the jury can say this police activity is such that we reject it, that we're not going to have CIs out there being improperly monitored, not recording conversations, and being pushy and pursuing people to do things when they've already told him, look, I'm not doing it, I'm out of this thing, it's done, and so you have two different instructions within the same, I guess, heading of, of, of entrapment. That's what I was requesting. So just to be sure I understand your response to Judge Jordan's question, I mean, so even accepting that it was error, I mean, just if we start with assuming it was error not to give the instruction, you've got to show prejudice. And as I understand what you're saying, and tell me how I've got this wrong. Because all the evidence... So the, the case, what you're saying, the case after Mr. Habib started cooperating with the government, the evidence was stronger then, and so if that hadn't, or if that, if the jury had believed she was entrapped as to that conduct, she might have been acquitted of the earlier conduct as well? Is that your... Yes, that's, that's what I believe in this case, because there was the aspect of the that she was actually the person, and she actually knew her after all these years had passed, that she was the one catching, because there was a myriad of people coming in and out doing this activity. So the bulk of the case really was at the tail end, which is when all this activity ensued. So, and if, and if you also have basically the jury finding that there is objective entrapment, they could reject the entire presentation of the government's case saying, look, this is improper, you shouldn't do this, this is not the way you investigate cases, and this is not the way to proceed. So you could have had the jury saying, giving them a not guilty on that aspect, because of the way that the bulk of the case was presented, that's all the evidence that they really had. There wasn't any independent evidence. And this ties into the conspiracy aspect of it, because you have a loose band of, I have to stop now, because it's a red light, so I'll make the rest of my argument. You've saved some time for rebuttal. Yes, I have. Thank you.  May it please the Court, Philip DeRose on behalf of the United States. Good morning, Your Honor. I don't think that this Court should give short shrift to my initial argument that this entrapment defense argument should be summarily dismissed, because it's mutually exclusive with what Mr. Rodriguez has already said was his primary feature defense, which is that her identity was stolen. I don't think you get or you're entitled to come in and say, on one hand, my identity was stolen, but on the other hand, I was entrapped. And the defendant's reliance on the case of Matthews v. United States in his reply brief at three does not help him, because that case involved a simple guilty plea, and the only issue was whether or not the defendant should be required to affirmatively admit that he committed the offense to get the benefit of the entrapment instruction. And the Supreme Court said, no, you don't have to do that. But this isn't a simple not guilty plea. She not only pleaded not guilty, she asserted the defense that her identity had been stolen, that it was a mistaken identity case. She shouldn't get the entrapment defense for that reason alone. But in any case, there's no support for the argument that Habib coerced her in any way. The agent never, there's no evidence here that Habib was loosely supervised. And Mr. Rodriguez uses the terms, first he said he was loosely supervised, then he said that the agent said he was difficult to supervise. Well, that's not the same thing. Yes, the agent had a difficult time supervising him, but that doesn't raise the inference that he was loosely supervised. I challenge Mr. Rodriguez to give a cite for the allegation that there was a two-minute conversation between Habib and Farr that was never recorded. I don't believe that that's in the evidence at all. It seems to me that the evidence shows that everything that went on between Habib and Farr was recorded. Mr. DeRosa, what, did the district court at the charge conference give a reason for why it did not believe that an entrapment instruction was not warranted? The court did give a reason. The court said that Mrs. Farr had not introduced or presented sufficient evidence to get the benefit of the instruction. On either one of the prongs, or both prongs, or did it elaborate? It didn't, the court didn't elaborate, Your Honor. Okay. So, there's no evidence of even mild coercion in this case. But the fact of the matter is that probably the government's strongest argument is that the evidence of her predisposition to engage in this type of behavior was overwhelming. I mean, she came into the conspiracy with her own team of ID forgers, and she was a member of two tax services already, her own, called Farr's Tax Service, and the one that she had with Press & Do called BD Tax Services. She was cashing checks even before Habib became a government informant. So, I'm not really sure about the whole idea of Mr. Rodriguez's argument that she was in the conspiracy and then she was being reengaged by the government. If that's some kind of code for saying that she left the conspiracy or withdrew from it, she never did. She never left the conspiracy. It was a seasonal conspiracy. She was there from year to year because all of the conspirators followed the tax season. So, it was a seasonal conspiracy. And to the extent that he raised these arguments in the district court and in his brief that she was on probation and that she left the conspiracy because of that, I don't give any credence to that. I mean, laying low because you're on probation is not the same thing as withdrawing from a conspiracy. I mean, this court has already got pretty clear guidelines of what you have to do to withdraw from a conspiracy. You have to make an affirmative withdrawal. You have to tell the other conspirators, I'm out. And you have to do something to disavow your participation in the conspiracy, like going to the police and disclosing the scheme. So, she never left the conspiracy. She was in from the get-go, from before Habib was a government informant until well after, from March 2013 until October of 2015. So, I think I've fully addressed the only argument that was presented here, the entrapment argument. If the court has any questions about any other, I can't go beyond that. But if the court has any questions about any other aspect of this case, I'll be happy to address those questions. With regard to the scope of the conspiracy, what is it that brought, that brings Vila into the same conspiracy as Farr? Well, Pressendu, who to my mind was the hub of this conspiracy, he was, as Jason Miles called him, the head of the horse. He was the guy who was the unifying rim for all these co-conspirators. He introduced Grace Vila to Habib. Habib had stopped doing business with Pressendu because he had too many checks that were dishonored, not honored by the banks. So, Pressendu said, fine, let's continue this with another person. I'm going to introduce you to Grace Vila. Same thing happened to Grace Vila. At a certain point, Habib stopped doing business with her. She turned around and introduced Latasha Farr. So that's the chain from Pressendu, as Jason Miles called him, the head of the horse, to Grace Vila to Latasha Farr. And as I said before, Farr straddles the line between the time Habib became a government informant. She was in the conspiracy before and she was in the conspiracy after. I see the chain you're describing, Pressendu to Vila to Farr, but what does that indicate? Farr had any knowledge of the existence of, what do we know about her and Pressendu? Well, Vila introduced Farr as an ex-girlfriend of Pressendu, so it's clear that Farr knew Pressendu. There's two things that connect them materially to the conspiracy. First of all, when you get to the evidence at sentencing, when Agent Dagnon testified, you see that Pressendu opened up BD Tax Services, and he opened it up under Farr's name, and she was the president and registered agent. She gave him, Pressendu, her EFEN, her electronic filing identification number, and there were at least 100 victims of BD Tax Services whose checks were cashed by BD Tax Services. Before Habib even became a government informer. So the district court put Farr on the hook for that, for Pressendu's cashing checks at BD Tax Services. Also, Farr knew Pressendu by another example, a material example. Habib said, look, you know, Pressendu gave me a lot of phony checks that the banks didn't honor, and the banks forced me to pay those checks out of my account. Farr says, tell you what, let me take care of that. I will agree to you taking a bigger cut out of the phony checks that I cash, so that Pressendu's phony checks can be reimbursed on your behalf. That's not something... Was any of that evidence that you just referred to from sentencing introduced at trial? Yes. The thing about Pressendu, about Farr reimbursing Habib for Pressendu's bad checks was introduced at trial. So that's a material connection between Farr and Pressendu, and that's part of the reason the district court tagged Farr for all of the checks that Pressendu cashed as well as the checks from their joint tax service, BD Tax Services. Thank you. Anything else? No. All right. Thank you very much. Thank you, Your Honor. I do want to respond to a couple things regarding the failure to give the instruction. It was clear that Habib had pushed and persuaded Ms. Farr in order to participate, and that is docket entry 255, page 38. And then Agent Degnam himself testified that Habib had an attitude and needed to be kicked in the rump, and that's a government's own brief at page 23, and then citing docket entry 256, 160 to 163. And then Habib continued to keep lines of communications open with the appellant using a desire to cash her original check. So that check, he kept that dangling because she had this check that she wanted to cash for $50,000. It came from a corporation that had closed. And there are numerous examples of him trying to draw her in to participate, docket entry 253 and 168, and he tried negotiating percentages and even making the offer more attractive, and then the appellant, and she refused even under those conditions, and he continued again and again, and all those are at docket entry 253, 168. As far as the conspiracy aspect, because the court asked about that, the reality is here that the center of this conspiracy happened to be Mr. Habib because he happened to own the cash checking store. The connection between these people that may have even known each other was fictitious at best because the reality was these people were competitors. They weren't even working together. They may have known each other. They may have been in the same neighborhood because these neighborhood stores have a limited area, but the reality is that knowing each other, even having a relationship outside of the conspiracy does not make one a conspirator. It was clear that she, in the testimony at trial, it became clear that Ms. Farr said, look, I don't have anything to do with those people. I'm not with those people. I don't work with those people. They were competitors. They weren't working together. Her situation was vastly different from the rest of the conspiracy, and that evidence came in at trial, and that's why Mr. Habib was so impressed because he said, look, your checks in the past always never got returned. Her modus operandi was completely different. She had filed returns for persons that were either out of the country or were deceased, so there was never a claim by someone else that their identity had been stolen because those checks were never returned. The rest of the group was having checks returned and all sorts of problems because they were operating completely differently. They were just basically stealing a Social Security number, filing a fake tax return, getting it, and hoping it sticks to the wall. Of course, what the government says in response to that argument is, well, she's agreeing to cover the debt of Mr. Pressady so that Mr. Habib would continue doing business with her. I'd just be interested in your response to that. That's if you believe the testimony of Mr. Habib saying that, that that's how he's justifying why he's reengaging her. But the reality is there's no evidence to show that other than his statement. There isn't any link. Which, of course, the jury had a right to believe. They had exactly. I agree with that part. I think that the jury could have believed that, but the reality is that the way that the evidence was presented here was entwined with the credibility of Mr. Habib, who was already suspect for not even being a good CI, and the fact that the jury was not apprised of the fact that her situation was vastly different and that the relationship between them was one of knowing each other from the neighborhood and that, in fact, she had been dating Mr. Pressady in the past. So it wouldn't be outside of reach to say that she had some sort of relationship with him, although not participating in the same conspiracy and not committing the same crimes or even working together. Taking it as a given that the jury was entitled to credit Habib's testimony, what error can you charge to the district judge? In this case, I think that using the evidence that, in the second set of the investigation, caused confusion to this jury because of the fact that they presented this evidence of these tape recordings, of all this new activity that was way disconnected from the time period. During a time period, by the way, that was clearly she was no longer having contact with any of these other people or any involvement, and that's clear. But he says, look, I don't talk to any of them, I have nothing to do with them, and so forth. So that was the evidence that the jury could have said, look, this person is obviously involved in something, we're just going to find them guilty. But the reality is that there was no real evidence, no real connection between them. This trial was not— What should the judge have done? What's the error? Should have told him to disregard Habib's testimony? I think he should have granted a Rule 29 on that factor because there wasn't evidence, and that's what I think he should have done. This trial was a very—I didn't mention this part, I think it's the most important part. This trial was with a pro se defendant representing himself, and I'm there representing Ms. Farr, and this is, to say the least, more than a three-ring circus. It was a spectacle, but the judge kept it in control. But to say the least, this thing was a highly charged environment. It was crazy, and it really made things extremely difficult. And what normally would happen in a trial, and I can tell you that the judge's patience must have been taxed a hundred, a thousand times because—and he was patient about it. But Mr. DeRonstadler had run of the courthouse. It really was that type of situation, and I think that that affected the jury's verdict. I think that affected everything. My time is up again. I thank the Court for its time. Thank you. We appreciate you being here to present your case. We understand that you're court-appointed and appreciate your service to the court, as we always do with the U.S. Attorney's Office as well. Thank you.